UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
DARREN TRANCYNGER,                          :

                              Plaintiff,    :   OPINION AND ORDER

        -v.-                                 :   16 Civ. 2153 (GWG)

COMMISSIONER OF SOCIAL SECURITY,            :

                              Defendant.    :
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Darren Trancynger brings this action to review the final decision of the

Commissioner of Social Security, finding that Trancynger was not disabled and thus not eligible

for disability insurance benefits.  Trancynger seeks to have the case remanded to the

Commissioner for further proceedings.  See Motion to Remand and/or for Judgment on the

Pleadings, filed Sept. 21, 2016 (Docket # 22) ("Pl. Mem.").  The Commissioner moves for

judgment on the pleadings to affirm the Commissioner's decision.[1]  For the following reasons,

the Commissioner's motion for judgment on the pleadings is granted and Trancynger's motion to

remand is denied.

I.  BACKGROUND

    A.  Procedural History

Trancynger filed for disability insurance benefits on August 22, 2012.  See SSA

Administrative Record, filed June 20, 2016 (Docket # 15) ("R."), at 9, 244.  The Social Security

---

[1] See Notice of Cross Motion, filed Oct. 21, 2016 (Docket # 27); Memorandum of Law in
Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of the
Commissioner's Cross-Motion for Judgment on the Pleadings, filed Oct. 21, 2016 (Docket # 28)
("Def. Mem.").

1

Administration ("SSA") denied Trancynger's application on October 9, 2012. R. 154-61.

Trancynger then requested a hearing before an Administrative Law Judge ("ALJ"). R. 162-64.

Two hearings were held: the first on October 4, 2013, R. 29-99, and the second on February 7,

2014, R. 100-43. In a November 6, 2014, ruling, the ALJ found that Trancynger was not

disabled. R. 9-21. Trancynger requested review of the ALJ's decision on December 18, 2014,

R. 5, and the Appeals Council denied that request on February 1, 2016, making the ALJ's

determination the Commissioner's final decision, R. 1-4. Trancynger brought this action on

March 23, 2016. Complaint, filed Mar. 23, 2016 (Docket # 1).

Trancynger asserts that he became disabled on August 1, 2011, when he stepped in a hole

while on patrol as a police officer, thereby wrenching his knee. R. 77, 244, 1392, 1872.

B. The Hearings Before the ALJ

1. October 4, 2013, Hearing

At the first hearing, Trancynger described all of the treating physicians he had seen for

his condition. R. 35-40. His primary doctor was Dr. Rick Sayegh, whom he saw "every month

or every few weeks." R. 39, 84.

Trancynger had had two knee surgeries, one in 2011 and one in 2012. See R. 38-39. At

the time of the first hearing, Trancynger had also recently undergone left heel surgery. R. 40.

Following the surgery on his heel, Trancynger still experienced pain in his heel and was seeking

a second opinion as to the pain and swelling following the operation. See R. 41-42. Trancynger

experienced little pain in his right heel. See R. 42.

The ALJ noticed Trancynger using a cane and Trancynger testified that he had been

using one since August 2011. See R. 42-43. Trancynger used a cane "all the time now," but it

appeared that the cane was not prescribed but rather provided by an acquaintance. See R. 76.

Trancynger estimated that he could remain standing for 10 minutes before sitting down. R. 70. However, Trancynger said that sitting down was "the worst because [he had] pain running down the left side of [his] back into [his] buttocks." Id. Trancynger could remain sitting for only five minutes before needing to move, by his own estimation. Id. Trancynger's inability to sit or stand had been getting progressively worse since his accident. R. 71. He suffered back pain on the job before, but Trancynger had never before experienced the "pain running down [his] legs," as had occurred after the accident, that led to his disability claim. See R. 71-72. Trancynger described the pain he experienced while sitting as "excruciating." R. 72.

The ALJ asked if Trancynger had been on a plane recently and Trancynger testified that he had flown to see his parents in Florida in May 2013. R. 43. Trancynger estimated that the total flying time was around two hours. See id. At the airport Trancynger used the "running escalator" to move around. R. 68. Trancynger tried to visit his parents once a year, and saw them once in 2013 and once in 2012. See R. 69.

Trancynger lived with his brother, R. 44, and used an elevator to travel to his sixth-floor apartment, R. 68. Trancynger could not walk up and down stairs. R. 43; accord R. 68. As required by the police department office of internal affairs, Trancynger had to stay at home due to his injury except that he could leave for doctor's appointments. See generally R. 72-73.

Trancynger still worked at the police department, but was awaiting the department's internal determination as to his disability. See R. 44-45. As part of the state's determination as to his workplace disability, Trancynger saw state physician Dr. John Mazella to evaluate his knee, heel, and back pain. See R. 45, 46-48; accord R. 1393-400.

Trancynger was taking Vicodin, ibuprofen 800, Percocet, Realize, Neurontin, Amrix, and an anti-inflammatory called nabumetone. R. 59-61, 74. Trancynger previously took muscle

relaxers like Flexeril and Skelaxin. R. 60. One of the possible side effects that Trancynger attributed to his prescribed medications — though he was not sure if it was actually a side effect — was a feeling "like [he is] going nuts almost." R. 73-74. Trancynger said he "forget[s] some of the conversation and [he will] forget what [he is] saying." R. 74. His medication also made him drowsy, though Trancynger said he was "kind of immune" to the drowsiness caused by the medication. See id.

Trancynger believed that his prescribed Vicodin was giving him severe headaches that lasted for 20 to 30 hours, R. 60-61, but stated that the Percocet had yet to produce such side effects, see R. 61. When he was having long, intense headaches, nothing would relieve the pain. R. 61. An MRI performed by a neurologist confirmed to Trancynger that the cause of the headaches was likely the Vicodin. See R. 62-63.

Evidence of these headaches and their causes was not in the record at the time of the hearing, and Trancynger said he would try to get records of them. See R. 63-64. The hearing ended with the ALJ's discussing with Trancynger's attorney plans to obtain additional medical records. R. 90-99.

2. February 7, 2014, Hearing

At the second hearing, Trancynger confirmed that he was 45 years old and had spent 15 years at the police department. R. 104-05. Trancynger was a patrol officer. R. 105. Shortly before the hearing, Trancynger had seen a City of Yonkers examining physician named Dr. Tutoral regarding his right knee. R. 107.

Between the first and second hearings, Trancynger underwent a laminectomy lumbar fusion surgery with Dr. Thomas Lee. R. 102, 105-06; accord R. 1407-11. Trancynger experienced numbness in his legs after the surgery, which he had never experienced before. See

R. 110-11.  Trancynger believed that the numbness was due to inflamation.  R. 111-12.

Trancynger eventually reduced the amount of Neurontin he was taking because he "wasn't

getting the pain down the legs anymore."  R. 112-13.  However, he began taking Neurontin again

in an effort to help with the numbness.  R. 113.  Trancynger did not mention any side effects of

the Neurontin.  R. 114.  While the pain in his legs was gone, R. 113, the numbness began to

bother Trancynger and he said he had no mobility or strength, R. 114.

Shortly before the second hearing, Trancynger began doing pool therapy for his back.

R. 115-16.  Trancynger said the therapy was "working" and he had "been feeling good."  R. 116.

The ALJ noted that Trancynger previously stated that sitting down was painful to his back and

asked if, because Trancynger was sitting down at the hearing, the surgery had helped his back

pain.  R. 117.  Trancynger said it had not.  Id.  Trancynger said the pain in his back was

"tremendous," making it hard to sit, stand or do any other routine activity, such as using the

restroom or opening a refrigerator door.  R. 118.  He hoped the surgery would eventually

improve his back, but at the time of the hearing it had not and Trancynger had "lost tremendous

amount[s] of muscle" in his back and arms.  See R. 122-23.

While Trancynger had complained of pain in his heels at the previous hearing, at the

second hearing he said he did not "have much problem with the pain in the heels now."  R. 119.

Trancynger also said his problems with severe headaches had subsided because he was "not

overdoing" it with pain killers.  Id.  While his attorney noted that Trancynger was sitting for up

to 15 minutes at the hearing "with some obvious discomfort," Trancynger said it was difficult to

sit there except that a brace he was wearing and his medications helped him avoid a lot of pain.

See R. 120.  The brace he mentioned helped Trancynger not overextend himself after his

surgery.  R. 120-21.

At the second hearing the ALJ took the testimony of a vocational expert ("VE"), Ms. Stein. R. 123-24. The ALJ asked the VE to assume a hypothetical worker with Trancynger's age, education, and work history who could perform a limited range of sedentary work, with the limitations that he could only occasionally stoop, kneel, and crouch; used a cane to walk; could only occasionally climb and descend stairs; had to avoid unprotected heights; could only occasionally push and pull with the upper extremities; and could not use foot controls. R. 125-26.

Based on this description, the VE said the hypothetical worker could not perform Trancynger's past work as a police officer. Id. However, the VE found that there were other jobs that someone with this hypothetical profile could perform. One such job was police clerk, DOT code 375.362-010, with a sedentary exertional level, and with 2,808,100 such jobs nationally. R. 127. The VE also listed police aide, DOT code 243.362-014, with a sedentary exertional level as another position available. Id. There were 2,808,100 police aide jobs nationally. Id. The VE also found that someone as described by the ALJ could also work as a telephone order clerk, a identification/security clerk, or a surveillance system monitor. R. 128-29.

The ALJ then changed the hypothetical by adding an at-will sit/stand option in addition to the hypothetical limitations listed above. R. 129. The VE said such a worker would not be able to perform Trancynger's past work as a police officer, but would still be able to perform the jobs of police clerk, police aide, telephone order clerk, identification/security clerk, and surveillance system monitor, which all had a sit/stand option. R. 129-30.

Finally, the ALJ altered the hypothetical by adding a requirement that not only would the worker need an at-will sit/stand option, but would also be off task 20% of the time in addition to

standard breaks.  R. 130.  The VE found no jobs available to such a person.  Id.  Trancynger's

attorney examined the VE on the requirements for the police clerk position.  R. 130-31.  After

reading the DOT's description of the position, the VE said that it would not be required for a

worker to handle physical files and that kneeling, crouching, crawling, and stooping were not

required for the job.  R. 131-33.

Trancynger's attorney asked about a hypothetical worker who could perform a limited

range of sedentary duties with occasional stair climbing, no unprotected heights, occasional

pushing and pulling, no foot controls, use of a cane, and no kneeling, crouching, or stooping.

R. 135-36.  The VE testified that even with this further limitation of no kneeling, crouching, or

stooping, the hypothetical worker could work as a police clerk, police aide, telephone order

clerk, identification/security clerk, or surveillance system monitor.  R. 136-38.  Trancynger's

attorney altered the hypothetical again by adding the requirement that no climbing of stairs be

involved, in addition to all previously listed limitations.  R. 138.  The VE again stated that such a

worker could perform the jobs of police clerk, police aide, telephone order clerk,

identification/security clerk, and surveillance system monitor.  See R. 138-39.

The ALJ closed the second hearing by confirming with Trancynger's attorney that

outstanding medical documents would be received into the record.  See R. 139-41.

C.  Medical Evidence

The Commissioner has provided a summary of the medical evidence contained in the

administrative record.  See Def. Mem. at 4-20.  Plaintiff has not objected to the summary, as had

been required by the Court to the extent she had objections.  See Scheduling Order, filed June

21, 2016 (Docket # 16), ¶ 5.  Accordingly, the Court adopts the Commissioner's summary as

accurate and complete for purposes of the issues raised in this suit.  We discuss the medical

evidence pertinent to the adjudication of this case in section III below.

D. The ALJ's Decision

The ALJ denied Trancynger's application for benefits in a written decision on November 6, 2014. R. 9-21. As an initial matter, the ALJ determined that Trancynger met the "insured status requirements of the Social Security Act through December 31, 2016," and had "not engaged in substantial gainful activity" since the alleged onset date of Trancynger's disability. R. 11. The ALJ found that Trancynger had several severe impairments, including "right knee osteoarthritis status-post right knee arthroscopy, lumbar spine disc herniation and bulges, thoracic lumbar sprain, status-post left plantar fasciitis surgery, bilateral plantar fasciitis, left knee osteochondritis, obesity, headaches, lumbar spine fusion surgery, . . . migraine headaches, [and] myofacial pain syndrome." Id. However, the ALJ found that none of these impairments, or combination of impairments, met or medically equaled the severity of the impairments listed in 20 C.F.R. part 404, subpart P, appendix 1. Id. The ALJ looked specifically at Listing 1.04, disorders of the spine, and Listing 1.02, major dysfunction of joints. See R. 11-12.

After examining the record, including the opinions of both Trancynger and his physicians, the ALJ determined that Trancynger had the residual functional capacity to perform sedentary work except that he "can occasionally stoop, kneel, crouch, push and pull, must use an assistive medical device such as a cane to ambulate, can occasionally climb and descend stairs, must avoid working from unprotected heights, cannot operate foot controls, and requires a sit stand option at will." R. 12. While the ALJ found that Trancynger's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," he found Trancynger "not entirely credible" as to the "intensity, persistence and limiting effects" of those symptoms. R. 13.

Based on the residual functional capacity determined for Trancynger, the ALJ found that Trancynger could not perform his past relevant work as a police officer.  R. 19.  However, because of Trancynger's age, his education of at least a high school level, his work experience, and his residual functional capacity, the ALJ found that there existed in the national economy, in significant numbers, jobs Trancynger could perform.  Id.  The ALJ noted that Trancynger could not perform the full range of sedentary work, but even with the additional limitations reflected in his residual function capacity, the ALJ found that Trancynger could perform the jobs of police clerk, police aide, telephone order clerk, identification clerk, and surveillance system monitor. R. 20.  Based on Trancynger's ability to perform other work in the national economy, the ALJ concluded that Trancynger was not disabled and was thus not eligible to receive disability benefits.  R. 20-21.

II.  GOVERNING STANDARDS OF LAW

A.  Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (internal quotation marks omitted) (quoting Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)); accord Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Selian,

708 F.3d at 417; Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (internal quotation marks omitted) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)); accord McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citing Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault, 683 F.3d at 447-48 (citing Dickinson v. Zurko, 527 U.S. 150, 153 (1999)). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 448 (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (internal quotation marks omitted) (quoting Hernandez v. Barnhart, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007)).

B. Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)) (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 404.1520(c). Third, if the claimant's impairment is severe and "meets or

equals" one of the listings in 20 C.F.R. part 404, subpart P, appendix 1, and "meets the duration requirement," the claimant must be found disabled. Id. § 404.1520(a)(4)(iii). Fourth, if the claimant's impairment does not meet or equal one of the listed impairments, or does not meet the duration requirement, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do the work he or she has done in the past, i.e., "past relevant work." Id. § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity, in addition to his or her age, education, and work experience, permit the claimant to do other work. Id. § 404.1520(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. Id. The claimant bears the burden of proof on all of these steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

## C. The "Treating Source" Rule[2]

In general, the ALJ must give "more weight to medical opinions" from a claimant's treating sources when determining if the claimant is disabled. See 20 C.F.R. § 404.1527(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician"). Treating sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as

---

[2] Regulations that came into effect on March 27, 2017, slightly alter the prior "treating physician" rule, introducing the term "treating source." See 20 C.F.R. § 404.1527(a)(2). The changes have no impact on this decision.

consultative examinations." 20 C.F.R. § 404.1527(c)(2). An ALJ must accord "controlling weight" to a treating source's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." Id. § 404.1527(c)(2). Inversely, the opinions of a treating source "need not be given controlling weight where they are contradicted by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted); accord Selian, 708 F.3d at 418 ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.") (citations omitted).

If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide "good reasons" for the weight given to that opinion or face remand. See Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (per curiam) (quoting Burgess, 537 F.3d at 129-30). When assessing how much weight to give the treating source's opinion, the ALJ should consider factors set forth in the Commissioner's regulations, which include (I) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant factors. See 20 C.F.R. § 404.1527(c)(2)-(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. § 404.1527(c)(2)-(6)). The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight

given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; see also Greek, 802 F.3d at 375-77.

D. Credibility Determinations

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citing Perales, 402 U.S. at 399) (additional citations omitted). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999) (summarizing and citing with approval the decision in Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)). Nonetheless, when discounting a claimant's credibility regarding his residual functional capacity, regulations impose some burden on the ALJ to explain his decision. As the Second Circuit has stated:

> When determining a claimant's [residual functional capacity], the ALJ is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929; see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980), but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49; see also 20 C.F.R. § 404.1529. To evaluate a claimant's assertion of a limitation, the ALJ must engage in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must

14

consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. Id. The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." 20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

Genier, 606 F.3d at 49 (alterations and emphasis in original).

The SSA has issued regulations relating to reports of pain or other symptoms affecting the ability to work by a claimant for disability benefits. 20 C.F.R. § 404.1529(c). These regulations provide, inter alia, that the SSA "will not reject [a claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [his] statements." Id. § 404.1529(c)(2). The regulations also provide that the SSA "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence." Id. § 404.1529(c)(4).

Where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carroll, 705 F.2d at 643); accord Craig, 218 F. Supp. 3d at 263. The ALJ must make this determination "in light of medical findings and other evidence[] regarding the true extent of the pain alleged by the claimant." Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (internal quotation marks omitted) (quoting McLaughlin, 612 F.2d at 705). However, where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's credibility determination "is

generally entitled to deference on appeal." Selian, 708 F.3d at 420 (citing Calabrese v. Astrue, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order)).  Thus, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints."  Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

E.  Law Governing An ALJ's Duty to Develop the Record

When an ALJ assesses a claimant's alleged disability, an ALJ must develop the claimant's medical history for at least the 12 months preceding the determination.  See Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) ("The ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceeding . . . .") (citations omitted); accord 42 U.S.C. § 423(d)(5)(B) ("[T]he Commissioner of Social Security . . . shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability."); Sims v. Apfel, 530 U.S. 103, 111 (2000) (ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits") (citing Perales, 402 U.S. at 400-01); 20 C.F.R. § 404.1512(d) (noting that the agency "will develop [an applicant's] complete medical history for at least the 12 months preceding the month in which [the applicant] file[s his] application").  The governing statute provides that the ALJ "shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" the disability determination.  42 U.S.C. § 423(d)(5)(B); accord 20 C.F.R. § 404.1512(b)(1).  An ALJ has a duty to develop the record regardless of whether the

claimant is represented by counsel.  Tejada, 167 F.3d at 774 (citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)); accord Cancel v. Colvin, 2015 WL 865479, at *5 (S.D.N.Y. Mar. 2, 2015) (citations omitted).

The duty to develop the record involves not only "obtain[ing] a claimant's medical records and reports but also the duty to question the claimant adequately." Brown v. Comm'r of Soc. Sec., 709 F. Supp. 2d 248, 256 (S.D.N.Y. 2010) (citing Cruz v. Sullivan, 912 F.2d 8, 11-12 (2d Cir. 1990); and Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755-56 (2d Cir. 1982)).  On the other hand, it is well established that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citation omitted).  If an ALJ has "already . . . obtained and considered reports" from treating physicians, the ALJ may have "before him a complete medical history, and the evidence received from the treating physicians [may be] adequate for him to make a determination as to disability." See Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996).

III.  DISCUSSION

Trancynger argues that the ALJ erred (1) in determining that Trancynger did not have a listed impairment, Pl. Mem. ¶ 4; (2) in giving no weight to the opinions of Doctors Mazella, Palmeri, and Citrome, as well as chiropractor Dr. Habif, who found that Trancynger was either in whole or in part disabled, id. ¶¶ 8, 10; (3) in determining his residual functional capacity, id. ¶ 4; (4) in failing to consider the side effects of the drugs Trancynger was prescribed, id. ¶ 6; and (5) in failing to properly develop the record in order to support his decision to discount treating sources or otherwise make an informed decision, see id. ¶¶ 11-12.

A.  The ALJ's Decision as to Listed Impairments

Trancynger argues that the ALJ erred in determining that he had no impairment or

combination of impairments that met or exceeded those listed in the relevant regulations.  Id. ¶ 4.

However, Trancynger makes no substantive argument on this issue, and fails to point to evidence

showing that Trancynger met the statutory listings.  Inasmuch as Trancynger does not identify an

alternative listing which the ALJ did not consider, we address the ALJ's decision based on

listings 1.02 and 1.04 of 20 C.F.R. part 404, subpart P, appendix 1.

As to whether Trancynger suffered from a major dysfunction of a joint, characterized by

"gross anatomical deformity" as required by 20 C.F.R. part 404, subpart P, appendix 1, section

1.02, there is evidence in the record affirmatively stating that Trancynger suffered from no

deformity.  See R. 423, 777, 780-82, 827, 1159-61, 1252-53, 1297-98, 1456-57, 1459, 1869.

Thus, the ALJ properly found he did not meet this listing.

As to the section 1.04 listing — a disorder of the spine, such as osteoarthritis — this

listing requires "compromise of a nerve root . . . or the spinal cord," with "[e]vidence of nerve

root compression characterized by neuro-anatomic distribution of pain, limitation of motion of

the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of

the lower back, positive straight-leg raising test," or spinal arachnoiditis or lumbar spinal

stenosis resulting in pseudoclaudication.  20 C.F.R. pt. 404, subpart P, app. 1 § 1.04.  The record

does not reflect these sorts of severe impairments.  Indeed, several physicians noted that

Trancynger's sensory and reflex responses were normal or intact.  See, e.g., R. 1146-47, 1159-

62, 1181, 1217, 1219, 1222, 1229, 1252-53, 1632, 1647, 1714.  Moreover, no physician

diagnosed Trancynger with spinal arachnoiditis or lumbar spinal stenosis resulting in

pseudoclaudication.  See generally R. 1488 (mentioning "recess stenosis" with no finding of

18

pseudoclaudication); R. 1630 (omitting to note lumbar spinal stenosis); R. 1636 (finding no stenosis).

B. Disability Determinations that Trancynger was "Totally Disabled"

Trancynger argues that the ALJ erred in "not giving [Dr. Mazella's] opinion weight" when Dr. Mazella claimed Trancynger was "totally disabled." Pl. Mem. ¶¶ 8, 10. Putting aside the fact that the ALJ did give some weight to Dr. Mazella's opinion, R. 17, "the ultimate finding of whether a claimant is disabled and cannot work," is to be made by the ALJ and "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); accord Green-Younger, 335 F.3d at 106; Torres v. Comm'r of Soc. Sec., 2016 WL 3911980, at *8 (S.D.N.Y. July 15, 2016); Suarez v. Colvin, 102 F. Supp. 3d 552, 573-74 (S.D.N.Y. 2015); see also Killings v. Comm'r of Soc. Sec., 2016 WL 4989943, at *13 (S.D.N.Y. Sept. 16, 2016) (noting that an opinion that a plaintiff suffered from conditions that made it impossible to work was "on an issue reserved to the Commissioner"). Further, because Dr. Mazella was an examining physician for state disability purposes, R. 106-07, the treating source rule did not apply and the ALJ could properly give his opinion little weight without further explanation. See, e.g., Campbell v. Comm'r of Soc. Sec., 2016 WL 6462144, at *12 (S.D.N.Y. Nov. 1, 2016) ("[C]onclusory statements that [claimant] is 'unable to work' are not entitled to controlling weight, whether in the context of a workers' compensation determination or otherwise."); Post v. Colvin, 2015 WL 1454931, at *8 (S.D.N.Y. Mar. 31, 2015) ("[The ALJ] correctly observed that [certain] opinions were not instructive because they were given in the context of a Workers' Compensation claim.") (collecting cases); Ramirez v. Astrue, 2014 WL 2520914, at *10 (W.D.N.Y. Mar. 28, 2014) ("Disability opinions under Workers' Compensation law are entitled to little weight given that Social Security law is

different than Workers' Compensation law.") (citation omitted); <u>Mortise v. Astrue</u>, 713 F. Supp.

2d 111, 125 (N.D.N.Y. 2010) ("[T]he ALJ was correct granting the disability findings 'little

weight,' because they were formed in a Workers' Compensation context.") (citation omitted);

<u>see</u> <u>also</u> 20 C.F.R. § 404.1504 ("[A] decision by any other governmental agency or a

nongovernmental entity about whether [a claimant is] disabled . . . is not binding on [the SSA]

. . . .").

    For the same reasons, the ALJ could also properly give little weight to chiropractor Dr.

Habif's opinion that Trancynger was "totally disabled," R. 17, as well as to the opinions of

Doctors Palmeri and Citrome, R. 18.  For all of these doctors, Trancynger fails to point to any

evidence in the record beyond their conclusory findings of "total disability" to support the

proposition that the ALJ erred in not accepting their conclusions.  <u>See</u> Pl. Mem. ¶¶ 8, 10.

Because the mere statement that a claimant is "disabled" is not determinative, <u>see</u>, <u>e.g.</u>, <u>Snell</u>,

177 F.3d at 133, the ALJ did not err in declining to accept these conclusions.

    C.  <u>The ALJ's Decision as to Residual Functional Capacity</u>

    As relates to residual functional capacity, Trancynger's central challenge is to the ALJ's

determination that Trancynger could perform sedentary work.  Pl. Mem. ¶ 4.  The relevant

regulation states:

> Sedentary work involves lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket files, ledgers, and small tools.
> Although a sedentary job is defined as one which involves sitting, a certain
> amount of walking and standing is often necessary in carrying out job duties.
> Jobs are sedentary if walking and standing are required occasionally and other
> sedentary criteria are met.

20 C.F.R. § 404.1567(a).  Additionally, and as already noted, the ALJ placed certain limitations

in his residual functional capacity finding, concluding that Trancynger would only

"occasionally" stoop, kneel, crouch, push and pull; that he must use an assistive medical device such as a cane to ambulate; that he can only "occasionally" climb and descend stairs; that he not work from unprotected heights; that he could not operate foot controls; and that he had to be able to sit or stand at will.  R. 12.

Three treating sources — Dr. Habif, Dr. Rahman, and Dr. Sayegh — two of whom are physicians, found that Trancynger had severe limitations in his ability to sit or stand, and that he could not do so for an entire eight-hour work day.  R. 1328, 1344, 1369.  These opinions, however, provide essentially no explanation and do not cite to any clinical findings in support. One is from a chiropractor, Dr. Habif, who, as the ALJ noted, R. 17, is not considered a recognized medical source under the relevant Social Security Regulations in effect at the time of the ALJ's decision.  See 20 C.F.R. §§ 404.1513(a), (d)(1), 404.1527(a)(2) (2016) (omitting chiropractors from list of "acceptable medical sources" in regulation in effect at time of ALJ's decision); accord O'Dell v. Colvin, 2016 WL 6882861, at *25 (S.D.N.Y. Nov. 22, 2016).

While these reports would provide a basis for finding the limitations Trancynger claimed, we cannot say that the ALJ's conclusion otherwise lacked substantial evidence to support it.  The ALJ points to a number of clinical findings inconsistent with the conclusion that Trancynger was incapable of sitting or standing in some combination for an eight-hour day.  R. 13-15, 16.  For example, throughout Trancynger's medical records, his doctors consistently found that he had five out of five strength and good range of motion in his lower extremities.  See R. 1121, 1123, 1219, 1222, 1229, 1271, 1281, 1284, 1313, 1453, 1458, 1548, 1549, 1612, 1614.  While Dr. Mazella, an examining physician, did state, conclusorily, that Trancynger was "permanently disabled," he also stated that Trancynger's pain was "out of proportion to injury," and that he suffered only from "[m]ild osteoarthritis" and a "[l]umbar strain/sprain."  R. 1881.  These mild

to moderate findings were consistent throughout the record.  For instance, Dr. Palmeri mentioned only "moderate restriction in range of motion," "moderate restriction in lateral bending and turning," and mild or no difficulty walking.  R. 466, 631, 710, 788, 1263, 1265, 1267, 1553, 1562.  Dr. Palmeri concluded that Trancynger had a "moderate partial disability." R. 466, 632, 1023, 1064, 1079, 1080.  Dr. Rahman similarly found five out of five strength, and a functional range of motion except with bending, which resulted in "increasing discomfort." See, e.g., R. 1284-85.  Like Dr. Palmeri, Dr. Rahman found only a "partial disability."  R. 1285, 1453.

Trancynger argues that the ALJ relied on treating physician Dr. Sergai Delamora's records to the detriment of other physicians who contradicted Dr. Delamora's findings.  Pl. Mem. ¶ 7.  Trancynger's main contention is that the ALJ erred in finding him to be "neurovascularly intact and able to walk with a normal gait," when the records of Drs. Lee, Rahman, and Sayegh showed that Trancynger was unable to walk.  See id.  Yet, it is undisputed that Dr. Delamora repeatedly concluded that Trancynger was neurovascularly intact.  See R. 775, 777, 780, 827, 1147, 1148, 1159, 1160, 1161, 1252, 1253, 1297, 1298, 1457.  Further, Dr. Delamora was not the only treating physician who found Trancynger neurovascularly intact through the summer of 2013.  Dr. Viscovich similarly found that Trancynger's "[n]eurovascular status [was] grossly intact."  R. 1197.  Similarly, Dr. Oh stated that Trancynger was "neurovascularly intact" in 2011, shortly after the alleged onset date.  See R. 411, 414.  Thus, there is substantial support for the ALJ's findings.

As to the report of Dr. Lee, Trancynger argues that any finding that Trancynger was "neurovascularly intact and able to walk" was "of course inconsistent" with Dr. Lee's findings. See Pl. Mem. ¶ 7.  That inconsistency is not obvious.  The medical record that Trancynger cites

is primarily a description of how Trancynger's surgery was performed.  See id. (citing R. 1407-11).  While Dr. Lee's pre- and post-operation diagnoses found "mechanical back pain and lumbar radiculopathy" and "[m]echanical instability," R. 1407-08, Dr. Lee ended his report by stating that Trancynger "was moving bilateral upper and lower extremities well," R. 1411.  Of course, Dr. Lee's surgical report does not purport to describe the limitations that would exist following recovery from surgery and does not cast doubt on the soundness of the ALJ's reliance on Dr. Delamora's findings.

Trancynger further argues that the records of Dr. Rahman show "a significant lumb[a]r nerve root impingement and disc injury."  Pl. Mem. ¶ 7.  The ALJ, however, considered the reports of Dr. Rahman and Dr. Sayegh, and correctly found that they indicated at most "a limited range of motion with forward bending due to pain."  R. 16; see R. 1376-77, 1453, 1458, 1459-60.  Relatedly, Trancynger claims that the ALJ erred in failing to consider Dr. Sayegh's conclusions that Trancynger needed to use a cane, could not sit for more than an hour, could not push or pull, and could not stoop, balance, kneel, or crouch.  Pl. Mem. ¶ 7.  Yet, the ALJ did take into account Trancynger's use of a cane in his residual functional capacity determination.  R. 12.  As to the other limitations, the ALJ was justified in reaching his conclusion based on the conflicting record evidence for the reasons we have stated above.

In addition, the ALJ rejected Dr. Habif's findings regarding Trancynger's limiations because "the limitations Dr. Habif identified are so severe that it would appear that the claimant would not be able to take care of himself and would need full-time nursing care."  R. 17.  Indeed, Trancynger himself stated that he could perform normal household and other activities alone, R. 800, and in examinations with Dr. Viscovich, Dr. Lee, and Dr. Rahman, Trancynger showed five out of five strength and functional range of motion, all the way through October 2013, see R.

1121, 1123, 1219, 1222, 1229-30, 1271, 1281, 1284, 1313, 1453, 1458. In examinations through 2013, Dr. Delamora also found that Trancynger had a "full range of motion with full strength," other than his right knee. R. 1548-49, 1614, 1632.

Trancynger also claims that the ALJ "ignored" the opinions of Doctors Citrome and Palmeri, who concluded that Trancynger was totally disabled. See Pl. Mem. ¶ 8. As an initial matter, the ALJ did not ignore these opinions. In fact, the ALJ gave "great weight" to Dr. Citrome's opinion, because it was consistent with the rest of the record, in determining that Trancynger could no longer perform his past work as a police officer. See R. 18. Further, Dr. Citrome was an examining physician for workers' compensation purposes and not a treating source. See R. 18, 1180-82. Therefore, as was true for Dr. Mazella, the treating source rule did not apply and the ALJ could properly give her opinion little weight as related to functional limitations for other work. R. 18.

The ALJ similarly addressed Dr. Palmeri's opinion in his decision. Id. While Dr. Palmeri did claim that Trancynger was "temporarily totally disabled from job duties," in a September 7, 2011, workers' compensation report, R. 384-85; see also R. 457-58 (stating that Trancynger was "temporarily totally disabled" in a September 19, 2011, follow-up report), as noted above this conclusory language is not binding on the ALJ. Further, the ALJ was correct in pointing out that Dr. Palmeri's disability determination was based on Trancynger's ability to perform his work as a police officer, not as to whether he was disabled as to every potential job under his residual functional capacity. See R. 18. Additionally, Dr. Palmeri's treatment notes indicate only a "moderate restriction in range of motion" and a similarly "moderate restriction in lateral bending and turning." R. 1553, 1562. Further, Dr. Palmeri found that Trancynger could walk on his heels and toes with only "mild difficulty." Id.

The ALJ also noted that Trancynger "described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." R. 18. While the ALJ erred, R. 18, in stating that Trancynger lived alone, see R. 44, 70, 294, 304, 797, 1525, this error does not undermine the ALJ's conclusion in light of the evidence that Trancynger engaged in activities of daily living such as dressing, personal grooming, preparing meals once or twice a week, and sometimes doing light laundry, R. 798-800, as well as the other evidence in the record supporting the ALJ's conclusion, as noted above.

We thus find that substantial evidence supported the ALJ's conclusion as to Trancynger's residual functional capacity.

D. The Side Effects of Trancynger's Medications

Trancynger alleges that the ALJ "failed to fully consider all of the evidence in this matter" with regard to Trancynger's medications, which "keep [Trancynger] from being able to concentrate and [whose] side effects would keep [Trancynger] from having any type of gainful employment." Pl. Mem. ¶ 6. Again, Trancynger points to nothing in the record to support these alleged side effects. See id.

In fact, the ALJ did consider any potential side effects, but correctly observed that Trancynger himself noted that "most of his medications cause no side effects." R. 12; see also R. 18-19. At the hearing, Trancynger claimed that Vicodin previously gave him the side effect of extreme and long-lasting headaches, but he stopped using that medication and the headaches subsided. R. 119-20; see also R. 60-62. Trancynger also testified that he sometimes felt "like [he was] going nuts almost," but he was not aware of that being a side effect of his medication. See R. 73-74. Further, while Trancynger claimed that some of his medications made him "drowsy," he said that he was "immune to that" side effect, and agreed that he had "adjusted" to

25

the drowsiness. R. 74. In addition, while the record contains notes that side effects of medication were discussed with Trancynger, R. 1089, 1118, 1376-77, 1485, these notes do not describe the side effects or mention that they limited Trancynger's ability to perform work. Finally, Trancynger himself, in an undated disability report, listed no known side effects to all of the medications he was currently taking. R. 307.

### E. Duty to Develop the Record

Trancynger argues — again, without pointing to any examples — that the ALJ "fail[ed] to fill in any gaps" in the record "if he did not believe that there was enough physical findings documented by the medical providers to <u>accept</u> [their] opinions." Pl. Mem. ¶ 11 (emphasis added); <u>see also id.</u> ¶ 12 ("It is most respectfully asserted that the record is incomplete . . . ."). But the ALJ does not have a duty to develop the record until there is enough evidence to support a conclusory statement regarding disability. The case that Trancynger cites in support of his argument that the ALJ failed to develop the record, <u>Rosa v. Callahan</u>, <u>see</u> Pl. Mem. ¶ 11, states that "where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." 168 F.3d at 79 n.5 (citing <u>Perez</u>, 77 F.3d at 48). While it is true "that an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record," <u>id.</u> at 70 (citing <u>Schaal v. Apfel</u>, 134 F.3d 496, 505 (2d Cir. 1998)), Trancynger has pointed to no such "clear gaps" nor to any physician's notes that are missing from the record, <u>see</u> Pl. Mem. ¶¶ 11-12. The record in <u>Rosa</u> was "scant," contained only "sparse notes" from a single physician, did not match the treatment history given by the claimant, and was missing "the records of a number of other physicians identified by [the claimant]." 168 F.3d at 79-80. The record in Trancynger's case is over 1800 pages long, with notes from every physician

Trancynger identified, see, e.g., R. 33-34, 37-40, 45, 55, 62, 96-97, 106-07, as well as some he did not, R. 374-75, 411-14. There are no apparent gaps in the record and the documents before the ALJ comprehensively detailed Trancynger's medical history from August 2011 to February 2014.

Trancynger also alleges that the ALJ erred by not calling his own medical expert if he believed the record did not indicate disability. See Pl. Mem. ¶ 12. The case Trancynger apparently relies on to support this argument, Lacava v. Astrue, 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27, 2012), does not support the need for the ALJ to have called his own expert. In fact, the Court in Lacava stated that an ALJ did not need to call its own expert if he "obtained all relevant treatment records available" and "made no indication in his opinion that he considered the medical data insufficient, or that he considered any part of the record ambiguous." See id. at *14. Those conditions are met here and we thus reject the argument that the ALJ failed to develop the record.

IV. CONCLUSION

For the foregoing reasons, the Commissioner's motion (Docket # 27) is granted and Trancynger's motion (Docket # 22) is denied.

SO ORDERED.

Dated: September 5, 2017
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge